IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

UNITED STATES OF AMERICA          *   Docket No. 6:22-cr-62
                                  *
                                  *
VERSUS                            *   August 23, 2022
                                  *
                                  *
TYCOBY ARCENEAUX                  *   Lafayette, Louisiana

********************************************************************

OFFICIAL TRANSCRIPT OF MOTION HEARING
HELD BEFORE THE HONORABLE DAVID C. JOSEPH,
UNITED STATES DISTRICT JUDGE

********************************************************************

**A P P E A R A N C E S**

FOR THE GOVERNMENT:   JOHN WOODLEY NICKEL
                      U.S. Attorney's Office
                      800 Lafayette Stree, Suite 2200
                      Lafayette, LA 70501


FOR THE DEFENDANT:    HAROLD D. REGISTER, III
                      McCorvey Law
                      102 Versailles Blvd., Suite 620
                      Lafayette, LA  70501


                      GARRON MATTHEW JOHNSON
                      Johnson & Johnson
                      839 St. Charles Avenue, Suite 309
                      New Orleans, LA  70130


REPORTED BY:          DEIDRE D. JURANKA, CRR
                      USDC - Western District of LA
                      611 Broad Street
                      Lake Charles, LA 70601

# I N D E X

**PAGE**

**COURT PROCEEDINGS**...............................   3
TREVOR PICARD
    DIRECT EXAMINATION BY MR. NICKEL.............   7
    CROSS-EXAMINATION BY MR. REGISTER...........  20
    REDIRECT EXAMINATION BY MR. NICKEL..........  39

1                        **COURT PROCEEDINGS**

2              THE COURT:  Good afternoon.  We're on the record

3        now in 22-cr-62, United States versus Tycoby Arceneaux.

4        Counsel, please make your appearances.

5              MR. NICKEL:  Good afternoon, Your Honor.  John

6        Nickel for the Government.

7              MR. REGISTER:  Harold Register, III on behalf of

8        Mr. Tycoby Arceneaux.

9              MR. JOHNSON:  Garron Johnson on behalf of

10       Mr. Tycoby Arceneaux as well, Judge.

11             THE COURT:  Good afternoon, gentlemen.

12       Mr. Arceneaux is present in court with counsel.  At this

13       time we are set for hearing on the Defendant's motion to

14       suppress evidence related to four separate incidents.

15       After reviewing the documents, my understanding is the

16       third search warrant -- that is of the second search

17       warrant of the house on 104 Royalton Parkway did not

18       yield any evidence; is that correct?

19             MR. NICKEL:  That's correct, Your Honor.  The point

20       would be moot.

21             THE COURT:  So really we're talking about three

22       incidents, the search of 1200 Robley, the apartment at

23       1200 Robley, and then the first search of 104 Royalton,

24       as well as the traffic stop of Mr. Arceneaux.  Okay.  I

25       think the best way to proceed is does the Government

1    have relevant law enforcement here?

2        MR. NICKEL:  Yes, Your Honor.  Can we discuss one

3    matter with the Court before we get started with

4    testimony?

5        THE COURT:  Sure.

6        MR. NICKEL:  There is an outstanding plea agreement

7    in this case and the defense attorney has been tendered

8    that plea agreement.  That plea agreement is contingent

9    upon it extinguishing after this motion to suppress,

10   right.  So I spoke with defense counsel.  I think

11   they're on the same page.  We would like to submit on

12   the briefs that we have and exhibits that we've attached

13   to our briefs for today's suppression hearing.  I've

14   agreed to leave the deal open that's currently been

15   extended to them if no officers take the stand today and

16   this matter is decided only on the briefs.  I'll let

17   defense counsel --

18       THE COURT:  Okay.

19       MR. REGISTER:  Your Honor, that is a correct

20   recitation of our intentions speaking to Mr. Nickel with

21   regards to the plea offer as well as submitting on the

22   briefs.  We also attached several exhibits to the motion

23   as well as a memorandum.  And as an additional exhibit

24   we'd like to offer, file, and introduce the transcript

25   of the preliminary hearing.  I believe the court

1    reporter filed that into the Court's record today.  So

2    we would like to have that as an additional exhibit with

3    regards to the motion as we submit on the briefs, Your

4    Honor.

5         THE COURT:  Okay.  All right.  I did get a call.  I

6    understand there was a call this morning, a motion to

7    continue the hearing, which is really improper in a lot

8    of ways.  We moved this back last week, I think the day

9    before the hearing, after we had set aside this time for

10   a hearing; and then to get another motion for

11   continuance on the date of the hearing is not

12   appropriate in this court at all.  You know, we have to

13   schedule things.  When we set aside time and take --

14   prepare for a hearing, it's not something that just can

15   be moved on a whim.  I understand there's plea

16   negotiations.  That's fine.  But if and when there's

17   indication that a date may not work, we need a notice

18   certainly well before the day of or the day before a

19   hearing.  Okay.

20        MR. REGISTER:  Yes, Your Honor.

21        MR. JOHNSON:  Yes, sir.

22        THE COURT:  Okay.  The issue with regard to the

23   search of 1200 Robley Drive, 3112, the issue is whether

24   or not this constitutes a bare bones affidavit that

25   negates the good faith exception to the exclusionary

1    rule.  Same with 104 Royalton Parkway.  The traffic stop
2    on January 28 I don't think is one that can be decided
3    on the briefs, frankly, so I think that's something that
4    we have to hear officer testimony about.
5         MR. NICKEL:  Judge, may I ask what issue of fact is
6    at issue in the vehicle stop?
7         THE COURT:  Well, I don't know, for example, what
8    the policy of the Lafayette Parish Sheriff's Department
9    is regarding doing inventory searches, whether he was
10   taken into custody before the search of the vehicle,
11   whether they were going to, in fact, execute the search
12   warrant.  I don't know how that transpired and whether
13   or not it was an inevitable discovery issue where they
14   were going to conduct the inventory search anyway,
15   whether the search of the vehicle would have been
16   permissible pursuant to a search incident to arrest.  So
17   I think there's some issues outstanding on that
18   particular topic.
19        MR. NICKEL:  Sure, Your Honor.  Two things.  I
20   would ask that we're allowed to be able to supplement
21   our motion with the actual police report from that
22   night.  And the second thing is we contend there was a
23   probable cause sniff of the vehicle by a canine that
24   night and that when Mr. Arceneaux was arrested it was
25   pursuant to an arrest warrant and that this was not a

1    traffic stop but, rather, a felony takedown.  So once he

2    was taken out of the car, arrested, then it didn't

3    become an issue because this was not a traffic stop.

4         THE COURT:  It's not whether he was held too long

5    at the stop.  That's not the issue.  But there's still

6    issues of fact about, you know, was there another person

7    that they were going to let drive the vehicle home.  I

8    just don't have enough information.  I don't necessarily

9    see that there's, you know, a suppression issue

10   depending on the series of events; but I don't know.  I

11   don't have enough information so I don't think we can

12   submit that on the briefs.

13        MR. NICKEL:  Would Your Honor allow me to

14   supplement the exhibit or the motion with the actual

15   police reports from that night?

16        THE COURT:  No.  Let's take some testimony.

17        MR. NICKEL:  Judge, the Government's going to call

18   Agent Trevor Picard of the LPSO, Lafayette Parish

19   Sheriff's Office.

20                      **TREVOR PICARD**,

21   after being first duly cautioned and sworn to tell the truth,

22   the whole truth and nothing but the truth, did testify on

23   oath as follows:

24                   **DIRECT EXAMINATION**

25   BY MR. NICKEL:

1     Q.   Good afternoon, Agent Picard.  Can you please state
2   your full name for the record.
3     A.   Trevor Picard.
4     Q.   Can you spell that.
5     A.   T-R-E-V-O-R, P-I-C-A-R-D.
6     Q.   Where do you work?
7     A.   Lafayette Parish Sheriff's Office.
8     Q.   How long have you worked with the Lafayette Parish
9   Sheriff's Office?
10    A.   Just over four years.
11    Q.   Okay.  Before the four years with the Lafayette
12   Parish Sheriff's Office, where'd you work before that?
13    A.   I worked for the Iberia Sheriff's Office,
14   St. Martin Sheriff's Office, and I was a reserve officer for
15   the Broussard Police Department prior to that.
16    Q.   Okay.  And how long was that?
17    A.   In total, 15 and a half years.
18    Q.   Can you pull that microphone a little bit closer to
19   you.  So you're currently with the narcotics division of the
20   Lafayette Parish Sheriff's Office; is that correct?
21    A.   Yes.
22    Q.   Did you have an opportunity to begin investigation
23   into Mr. Tycoby Arceneaux?
24    A.   I assisted in one, yes.
25    Q.   Okay.  Can you tell us how that investigation

1    began.

2         A.    Initially in 2021 information was received by

3    another agent in reference to Tycoby, I believe, selling

4    marijuana.  He wasn't what I would call, like, a specific

5    high level target or anything like that.  It was just

6    essentially just some information received and whenever we

7    had time or whenever we were in the area we would look into

8    him, and the address we initially had received was the

9    address on Royalton.

10        Q.    Okay.  You initially got that address on Royalton

11   as a place where Mr. Arceneaux lived, correct?

12        A.    Yes.

13        Q.    Did you have an opportunity to conduct surveillance

14   on Royalton?

15        A.    Yes.

16        Q.    Okay.  Did that tell you anything into your

17   investigation of whether he lived there?

18        A.    I personally did not see him there.  There were

19   some vehicles that we -- that I was personally told about

20   that we did see there, but on the occasions that I was there

21   I had never actually seen him there.

22        Q.    Did your investigation eventually take a turn from

23   Mr. Arceneaux being, you know, a simple marijuana dealer to a

24   bigger scale dealer, larger scale dealer?

25        A.    Yes.

1    **Q.**   Tell me how that happened.

2    **A.**   In the beginning of 2022 agents with the narcotics

3  unit spoke with a source of information who eventually turned

4  into a confidential informant that explained that Tycoby was

5  selling large amounts of methamphetamine from an apartment on

6  Robley Drive, which was Ansley Walk Apartments.

7    **Q.**   And would I be correct in saying that's Apartment

8  3112?

9    **A.**   Yes.

10   **Q.**   Okay.  Before we get to the search warrant on that,

11  are you familiar with the investigation of Mr. Arceneaux

12  beginning in 2022 when some warrants were -- when some

13  warrants were received for Mr. Arceneaux's arrest?

14   **A.**   Yes.

15   **Q.**   And can you tell us more about that.

16   **A.**   During the ongoing investigation we attempted to

17  conduct surveillance which included following Mr. Arceneaux

18  in vehicles.  And on one occasion we attempted to follow him

19  and on that specific occasion he was driving extremely

20  erratic high rates of speed, changing lanes without

21  signaling.  So on that specific occasion we'd actually lost

22  him earlier in the day.  And while I was driving, going to

23  another location, he actually stopped on the side of me on a

24  Bertrand Drive and I looked over and it was him.  I was like,

25  oh, there he is.  So we started following him again.  His

1    driving behavior was the same, driving well over the posted

2    speed limit, changing lanes without signalling, just erratic

3    driving behavior.  So based on that, I applied for and was

4    granted an arrest warrant for reckless operation of a motor

5    vehicle by Commissioner Doguet.

6        Q.   So is it safe to say this erratic behavior you had

7    seen on other occasions or you'd heard about from other

8    agents?

9        A.   I had seen it on other occasion and, yes, other

10   agents had mentioned that his driving behavior was erratic.

11       Q.   Was it to the point where you would describe it as

12   maybe counter-surveillance?

13           MR. REGISTER:  Objection, Your Honor, leading.

14           THE COURT:  Sustained.

15   BY MR. NICKEL:

16       Q.   You've seen Tycoby Arceneaux drive in patterns that

17   are unfamiliar, correct?

18       A.   Yes.

19       Q.   Can you describe those patterns to us.

20       A.   On some occasions he would cut through parking

21   lots.  He would make blocks that just seemed unnecessary.

22   His driving was -- I guess unpredictable would be, I guess, a

23   way to describe it.  Like I said, he would make several turns

24   and end up going back on the same road the direction he'd

25   already come from, which was just obviously very odd.

1    **Q.**   Had you seen these patterns before, based off your

2    training and experience?

3    **A.**   Yes.

4    **Q.**   And what did they mean to you?

5    **A.**   It's normal for people who do those type of things

6    to do that for the purpose to see if any vehicles are

7    following them.  Like I said, to make several blocks to go

8    back the same direction, there's really no reason to do that

9    several times.  So, in my experience, I've seen it to where

10   it's to see what vehicles are still behind them.  Because if

11   you do that several times and there's still certain vehicles

12   behind you, then obviously, if you're doing that for no

13   reason, there's no reason for other vehicles to continue

14   doing that with you.

15   **Q.**   Is there a term for this in criminal

16   investigations?

17   **A.**   Yes.

18   **Q.**   What is that?

19   **A.**   Counter-surveillance.

20   **Q.**   Okay.  Did you get a warrant for reckless driving

21   for Mr. Arceneaux on January 26, 2022?

22   **A.**   Yes.

23   **Q.**   Okay.  Did you have an opportunity to execute that

24   warrant?

25   **A.**   Yes.

1      **Q.**   Can you tell us more about that.

2      **A.**   On January 28th we had located Mr. Arceneaux on

3  Fieldspan Road.  We were able to catch up to him and he was

4  driving at a high rate speed on Fieldspan Road.  We saw him

5  turn onto Demette Road, and by the time we were able to get

6  there he'd already turned into a driveway.  I believe the

7  address is 112, something like that, Demette Road.  And we

8  located him in the driveway of that address.

9      **Q.**   Okay.  Were any -- did any units that pulled him

10 over have their lights on?

11     **A.**   So it wasn't -- he wasn't pulled over.  As I said,

12 he was driving at a high rate of speed so by the time I was

13 able to catch up I was able to see that it was that vehicle.

14 And also, the sheriff's office Real Time Crime Center was

15 monitoring license plate readers so they were able to notify

16 us when that vehicle, the silver Chevy Silverado with a

17 specific license plate, I don't recall it offhand, was in a

18 certain area.  So once they were able to tell us that, I was

19 able to see it from a distance.  Traffic was real light at

20 the time, it was late at night, so I was able to see it.  By

21 the time that I got there, I was able to visually confirm

22 that that was the vehicle.  As I said, it was already parked

23 in the driveway so it wasn't a, you know, like, the police

24 get behind you, put their lights and siren on, you pull over

25 type of stop.  The vehicle was already stopped.

1          We knew that it was commonly occupied by Mr. Arceneaux.

2    He had an active arrest warrant, and we also had some pending

3    narcotics charges from that night as well.  So it was

4    essentially more like an investigative takedown of the

5    vehicle.  So I don't think any lights were activated.  I

6    think we just got out, identified ourselves and --

7          Q.   Was he immediately arrested?

8          A.   Yes.

9          Q.   Okay.  Can you -- he got out of the driver's seat

10   or the passenger seat?

11         A.   The driver's seat.

12         Q.   He is taken out of the driver's seat by you or

13   someone else, or does he step out?

14         A.   He was instructed to step out.

15         Q.   Okay.  Is he immediately detained?

16         A.   Yes.

17         Q.   Okay.  The silver Chevy Silverado, was it the same

18   car he was in on January 26th?

19         A.   Yes.

20         Q.   Okay.  So same vehicle.  So once he is detained,

21   what did you elect to do next?

22         A.   Initially we had called for a wrecker to come and

23   get the vehicle, but it was determined not long after that

24   the address was -- belonged to the female passenger that he

25   was with so we went ahead and canceled the wrecker because

1    she obviously was okay with it being there.  So we canceled

2    the wrecker.  And obviously, because of the investigation

3    prior that night, we definitely felt we had plenty of

4    reasonable suspicion and borderline probable cause to search

5    the vehicle.  But there was a patrol canine working so, just

6    to reiterate, we decided to call for the canine to come and

7    do a sniff of the vehicle prior to us conducting a search.

8         Q.   Let's back up a little bit.  Did anyone, either the

9    female on scene or Mr. Arceneaux, say that the vehicle was

10   theirs that night?

11        A.   Yes.  I informed Mr. Arceneaux of his rights per

12   Miranda, explained to him why he was being arrested and why

13   he was there.  And while speaking with him I asked him if the

14   vehicle was his.  He explained it was a rental and it was for

15   him.

16        Q.   And the female, did she give any statements?

17        A.   She explained that they were friends.  And she said

18   she had some keys, a phone, and some food in the truck, and

19   she said nothing else inside of the truck belonged to her.

20        Q.   Was she ever detained?

21        A.   I believe initially she was, but I think after not

22   long she was -- she wasn't detained in handcuffs for very

23   long, if I remember correctly.

24        Q.   So you were at a point -- and we'll go back forward

25   to where we were at.  You were at a point where you decide

1   not to get a wrecker because the female on scene lived there

2   and the truck was fine there, correct?

3        A.   Yes.

4        Q.   However, there was a determination in your head

5   about whether to even get a canine, whether it was necessary,

6   correct?

7        A.   Yes.

8        Q.   You felt like you had probable cause at that point

9   to search that vehicle based off what you'd found previously?

10            MR. REGISTER:  Objection, Your Honor, leading.

11            THE COURT:  Sustained.

12   BY MR. NICKEL:

13        Q.   Okay.  Do you recall when you called the canine

14   unit?

15        A.   Yes.

16        Q.   How many minutes into the stop is this canine unit

17   called?

18        A.   I would say maybe 10, 10ish, 10, 12 minutes,

19   somewhere in there.

20        Q.   Okay.  Is this after you had gotten Mr. Arceneaux

21   detained, out of the car?

22        A.   Yes.

23        Q.   Questioned the female there?

24        A.   Yes.

25        Q.   Okay.  Do you recall how long it took the canine

1  unit to get there?

2       A.   Maybe another 10, 15 minutes.

3       Q.   Okay.  At this point Mr. Arceneaux was already

4  arrested on the arrest warrant, correct?

5       A.   Yes.

6       Q.   As well as a probable cause arrest based on the

7  items you found in his apartment, right?

8       A.   Yes.

9       Q.   Okay.  Once the canine unit showed up, were you

10 still on scene?

11      A.   Yes.

12      Q.   You know the canine officer?

13      A.   Yes.

14      Q.   Who was that?

15      A.   Deputy Jamal Tucson.

16      Q.   Okay.  Do you see Mr. Arceneaux in court today?

17      A.   Yes.

18      Q.   Can you identify him, please.

19      A.   He is sitting in the table to the right with the

20 orange shirt.

21           MR. NICKEL:  Judge, I have no further questions at

22      this time.

23           THE COURT:  Okay.  Detective, you stated you

24      believe you had probable cause to search the vehicle

25      prior to the Defendant's arrest on the reckless driving

1    warrant.  Articulate what bases you thought you had to

2    establish probable cause to search the truck.

3         THE WITNESS:  So we'd received information about

4    him being a larger level narcotics dealer.  We had

5    executed a search warrant maybe a couple hours prior to

6    that stop and a large amount of narcotics, weapons, and

7    currency was located which confirmed the information

8    that we'd received.

9         THE COURT:  And that was where?  Where was that

10   search?

11        THE WITNESS:  1200 Robley, Apartment 3112.  And

12   also, because of the LPR's, we had learned that

13   Mr. Arceneaux had left going on I-49 north and I believe

14   he was going for several hours in the afternoon and had

15   just returned -- to our knowledge, had just returned.

16   So because of the information, the confirmation with the

17   search warrant and the evidence that was located, and

18   then him just returning from going up north, we felt

19   that at least reasonable suspicion that he would have

20   narcotics in the vehicle and potentially probable cause

21   that he was using the vehicle to transport and to sell

22   narcotics.  We believed that we had it but, as I said,

23   because we had a canine at our disposal, we figured we

24   would use that to strengthen what we had already.

25        THE COURT:  And what was -- where was the vehicle

1        when you conducted the search?

2             THE WITNESS:  It was in the driveway of 112 -- I

3        think it was 112 Demette.

4             THE COURT:  112 what?

5             THE WITNESS:  I think it's Demette, D-E-M-E-T-T-E,

6        I believe.

7             THE COURT:  And whose residence was that?

8             THE WITNESS:  I think her name is Sabrina

9        Babineaux.

10            THE COURT:  And did you ultimately leave the truck

11       there?

12            THE WITNESS:  Yes.  She ultimately elected to take

13       possession of it, and Mr. Arceneaux was okay with that.

14            THE COURT:  That was the passenger, Sabrina

15       Babineaux?

16            THE WITNESS:  Yes.

17            THE COURT:  And how long did you say, before the

18       arrest of Mr. Arceneaux, was the search of Robley

19       conducted?

20            THE WITNESS:  Maybe a few hours.

21            THE COURT:  And did you -- were agents -- did

22       agents find anything during that search linking that

23       apartment to Mr. Arceneaux?

24            THE WITNESS:  Yes.

25            THE COURT:  What?

1        THE WITNESS:  There were photographs of him inside

2     the living room area, of him specifically in one and him

3     with Mabreka Arceneaux.  I can't remember her specific

4     name, and it was him, her, and another male that we

5     recognized as being a narcotics dealer and another

6     female.  It appeared that they were on vacation.  And

7     there was mostly male clothing, shoes, things of that

8     nature inside.

9        THE COURT:  Okay.  And what exactly was -- what

10    drugs were taken by law enforcement during that search?

11       THE WITNESS:  There was approximately 10 pounds of

12    methamphetamine and a small amount of marijuana, was the

13    narcotics specific that was taken.

14       THE COURT:  All right.  And what was ultimately

15    found in the truck?

16       THE WITNESS:  There was less than a gram of

17    methamphetamine inside of a bag with some male clothing,

18    less than a gram of marijuana on the floor underneath

19    the radio in the front area, and there was also some

20    drug paraphernalia that was consistent with the items

21    and the methamphetamine that was at the apartment as

22    well.

23       THE COURT:  Okay.  Cross-examination?

24       MR. REGISTER:  Yes, sir.

25                    CROSS-EXAMINATION

1    BY MR. REGISTER:

2       Q.   Good afternoon, sir.  Are you familiar with the

3    search warrant that was issued in this particular case?

4       A.   Which one, sir?

5       Q.   Any of them, all three of them.

6       A.   Not -- I mean, I know that they were.  I don't know

7    the specifics in them.

8       Q.   Because I remember testimony testified regarding a

9    confidential informant that was --

10           MR. NICKEL:  Judge, I'm going to object right now

11       to any attempt to get into the identity of the

12       confidential informant.

13           THE COURT:  Are you planning on doing that?

14           MR. REGISTER:  No, sir.

15           THE COURT:  We're not getting into that.  You can

16       reference the confidential informant, but I'm going to

17       instruct the witness don't answer information that would

18       compromise the identity of the confidential informant.

19       You can ask questions about any past relationship with

20       the confidential informant, things of that nature,

21       but --

22           MR. REGISTER:  Yes, sir.

23    BY MR. REGISTER:

24       Q.   So with regards -- so I think your testimony was

25    that there was a source of information that eventually turned

1    into a confidential informant, correct?

2         A.   Yes.

3         Q.   And the information that you gained, I'm not saying

4    that you personally, but that agents gained from this

5    individual was then utilized for the search warrant, correct?

6         A.   I don't know.  I don't know if that specific

7    information was used as part of the search warrant or if it

8    was just used as information for the investigation.  I don't

9    know.

10        Q.   Okay.  Prior to utilizing this confidential

11   informant in this particular case, how many arrests has this

12   individual been responsible for?

13             MR. NICKEL:  Same objection, Your Honor.

14             MR. REGISTER:  Your Honor, we're not asking --

15             THE COURT:  He's entitled to ask about the

16        reliability of the confidential informant.

17        A.   I don't believe any.  As I said, initially they

18   were a source of information that became a confidential

19   informant.  So I don't believe that they were involved in any

20   arrests prior to because they were a new confidential

21   informant.

22   BY MR. REGISTER:

23        Q.   And since they weren't involved in any arrests,

24   that means that the information given to you has never led to

25   any convictions, correct?

1        A.    I'm sorry.  The information they gave?

2        Q.    Information from the confidential informant prior

3   has never led to any convictions of anyone, correct?

4        A.    I don't know that they gave any information prior.

5        Q.    Okay.  With regards to this confidential informant

6   utilized in this particular case, there were no drug --

7   hand-to-hand drug transactions or drug buys at any of the

8   residences, correct?

9        A.    At the direction of the sheriff's office?

10       Q.    At any one -- there's no information to say that

11  this confidential informant, whomever he or she is, actually

12  conducted a hand-to-hand transaction with Mr. Tycoby

13  Arceneaux out of any of the residences in this particular

14  case, correct?

15       A.    They provided information and advised that they

16  did.

17       Q.    Okay.  Whenever you -- was there any -- I guess

18  going back to what you said before, at the direction of the

19  sheriff, I guess to confirm what this individual had said,

20  this person was never equipped with an audio or video

21  monitoring device to conduct a transaction, correct?

22       A.    Not that I'm aware of, no.

23       Q.    This individual was never, through the direction of

24  the sheriff, texting Mr. Arceneaux to conduct a transaction,

25  a drug transaction, correct?

1              MR. NICKEL:  Judge, I'm going to lodge an objection

2       that this is outside the scope of direct examination.

3       We seem to be on the warrant for Apartment 3112, Robley

4       Drive, where this witness did not author that affidavit

5       whatsoever and is for the stop of the vehicle, like we

6       discussed initially.

7              THE COURT:  Yeah, that's right.  However, the

8       probable cause for the search of the automobile is based

9       largely on the results of the search of Robley Drive so

10      I'm going to allow Mr. Register to explore that a little

11      bit.

12      A.   Can you ask your question again?

13             MR. REGISTER:  Can you state my last question?  I'm

14      sorry.

15                (Reporter reads back as requested.)

16      A.   The C.I. wasn't mine so I don't know if anything --

17      any conversations were at the direction of the handling

18      agent.  So I don't know.

19      BY MR. REGISTER:

20      Q.   Okay.  Now, with regards to -- have you seen the

21      search warrant?

22      A.   Have I seen it?

23      Q.   Yes.  Have you seen the search warrant?  Because I

24      believe you said that was a basis of your, I guess, felony

25      takedown.  So have you seen the affidavit in support of the

1    search warrant?

2         A.   I may have.  I don't know.  I don't specifically

3    remember.  I may have looked at it or helped proofread it,

4    but I don't specifically remember.

5         Q.   Do you know if there was any information within the

6    search warrant to establish the reliability of this

7    confidential informant?

8         A.   Again, I don't know if the information from the

9    informant was even used in the search warrant or if it was

10   used just to -- for the information to lead to that

11   apartment.  I don't know.

12        Q.   Now, this particular apartment which related to the

13   first search warrant in this case, at any point in time did

14   you observe or did agents observe Mr. Arceneaux carrying any

15   bags inside of the residence?

16        A.   Yes.

17        Q.   At any point in time --

18        A.   I'm sorry.  Could you -- were you asking if that's

19   in the search warrant or is that -- are you just asking in

20   reference to the investigation?

21        Q.   With reference to the investigation.

22        A.   Yes.

23        Q.   Okay.  Do you know if that was placed in the search

24   warrant?

25        A.   No, I don't.

1      Q.   Isn't it a fact that officers never observed

2 Mr. Arceneaux committing any illegal criminal activity,

3 outside of the traffic violations which are alleged, but any

4 illegal activity with regards to drugs at that particular

5 residence?

6      A.   Rephrase your question.

7      Q.   For example, whenever officers were conducting

8 surveillance did officers smell any marijuana emitting from

9 that particular residence?

10     A.   Not that I'm aware of.

11     Q.   Isn't it a fact officers never observed any illegal

12 guns or firearms being held by Mr. Arceneaux whenever he

13 allegedly left the residence or entered into the residence?

14     A.   Not that I'm aware of.

15     Q.   Isn't it aware -- isn't it a fact that officers

16 never observed any illegal activity of Mr. Arceneaux prior to

17 the issuing of this particular search warrant in this case

18 with regards to Mr. Arceneaux leaving and going from this

19 particular residence?

20     A.   I am aware of part of the affidavit for the search

21 warrant being that while Mr. Arceneaux was at the apartment

22 agents observed what they believed to be a narcotics

23 transaction take place at that apartment.  So I would say

24 that there was what agents believed to be criminal activity

25 taking place while he was there, yes.

1        Q.   So along with that part in the affidavit -- I'd

2    asked earlier if you were familiar with the affidavit.  So

3    you're familiar with that part of the affidavit with regards

4    to agents allegedly observing a drug transaction, correct?

5        A.   I'm not familiar with the affidavit.  I know I was

6    there and I was assisting at that point of the investigation.

7    So to tell you what the affidavit says in regards to it, no,

8    I don't know.  I just know that that was part of the probable

9    cause for it.  But to tell you what the search warrant says,

10   I don't know.

11       Q.   So going along with that particular example that

12   was mentioned, that was testified to, isn't it a fact that

13   there was no hand-to-hand transaction that occurred at that

14   particular point in time?

15       A.   I don't know.  From my understanding, it took place

16   inside so I don't know that anybody could have seen it but --

17       Q.   So it's a fact that agents did not observe a

18   hand-to-hand transaction occur at the residence of Mr. Tycoby

19   Arceneaux?

20            MR. NICKEL:  Objection, asked and answered.

21            THE COURT:  Overruled.  Did they see it?

22            THE WITNESS:  To my understanding, it wasn't seen

23       because it occurred inside the apartment.

24   BY MR. REGISTER:

25       Q.   Isn't it a fact that -- well, I believe I asked

1    about any weapon.  I said guns, but is there any illegal

2    weapons seen at the residence of Mr. Arceneaux prior to the

3    search warrant being executed in this case?

4        A.   Not that I'm aware of.

5        Q.   I believe you testified that there was information

6    that Mr. Tycoby Arceneaux was selling marijuana, correct?

7        A.   From my understanding, that's -- from my

8    understanding, that's how it initially started and then it

9    turned into that he was also selling large amounts of

10   methamphetamine.

11       Q.   Isn't it a fact that there's no witnesses or any

12   law enforcement has never observed Mr. Tycoby Arceneaux

13   selling marijuana?

14       A.   Observed it?

15       Q.   Correct.

16       A.   So, yet again from my understanding, the

17   hand-to-hand transaction that was done a subsequent -- or,

18   excuse me, the believed hand-to-hand transaction that was

19   done led to the discovery of marijuana.  So I believe that

20   there was -- that there is evidence that he was.

21       Q.   Now, at the time that this particular warrant was

22   executed Mr. Tycoby Arceneaux was not at the residence,

23   correct?

24       A.   I'm sorry.  Say again.

25       Q.   At the time the search warrant was executed

1    Mr. Tycoby Arceneaux was not at the residence, correct?

2        A.   No.

3        Q.   There was no traffic stop -- I'm sorry.  There was

4    no traffic violations that was committed by Mr. Arceneaux to

5    effectuate the stop at the residence as far as the vehicle,

6    where it was eventually stopped?  I think it was Al Dente

7    Road?

8        A.   Demette.  Yeah, I believe I had said that I caught

9    up to him at Fieldspan and Ridge and that he was traveling at

10   a high rate of speed at that point as well.

11       Q.   And at that particular point in time there was no

12   traffic stop, right, at that point?

13       A.   We weren't able the catch up to him to do one, no.

14       Q.   Now, with regards to the passenger in this case,

15   she wasn't arrested, right?

16       A.   No, she was not.

17       Q.   At the time that Mr. Arceneaux was apprehended at

18   the residence with the vehicle he was immediately detained?

19       A.   Yes.

20       Q.   Immediately placed in handcuffs?

21       A.   Yes.

22       Q.   Immediately removed from the vehicle?

23       A.   Yes.

24       Q.   So, basically, he wasn't able to grab anything at

25   that particular point in time as far as wingspan or anything

1    like that?  He was removed from the vehicle and placed in the

2    officer's vehicle?

3        A.   Yes.

4        Q.   Same thing with the passenger; she was immediately

5    removed from the vehicle?

6        A.   Yes.

7        Q.   Doors were closed?

8        A.   To the vehicle?  I don't know if they were

9    immediately closed.  I don't know.

10       Q.   There was no consent given by Mr. Arceneaux or the

11   passenger to search the vehicle, correct?

12       A.   No.

13       Q.   At that particular point in time, once both

14   occupants of the vehicle were detained and away from being

15   able to reach inside the vehicle to hide or to discard any

16   evidence, there was no smell of marijuana, correct?

17       A.   No.

18       Q.   There was no drug -- there were no drugs observed

19   in plain view, correct?

20       A.   No.

21       Q.   There were no weapons or any illegal weapons

22   observed in plain view, correct?

23       A.   No.

24       Q.   Upon being in the vicinity of the passenger, the

25   passenger did not emit of any marijuana, correct?

1        A.    I'm sorry.  Say again.

2        Q.    The passenger did not smell like marijuana,

3    correct?

4        A.    No.

5        Q.    The passenger, as you could see, did not have any

6    type of bulges that would have resembled any type of weapons,

7    correct?

8        A.    No.

9        Q.    Same thing for Mr. Arceneaux; whenever

10   Mr. Arceneaux was immediately detained, Mr. Arceneaux did not

11   smell of marijuana, correct?

12       A.    No.

13       Q.    Mr. Arceneaux did not have any bulges which may

14   have depicted him of hiding or concealing any dangerous

15   weapons, correct?

16       A.    No.

17       Q.    While on the scene on this particular day with

18   regards to the felony takedown, you didn't observe any

19   illegal activity of either the passenger or Mr. Arceneaux,

20   correct?

21       A.    No.

22       Q.    Now, you said 10 to 12 minutes into the stop, after

23   the mission of this particular felony takedown was completed,

24   that's when the canine was called, correct?

25       A.    No, sir.  The time is correct; but the statement

1    about the mission, no, sir, that's not correct.

2        Q.   So the mission to take Mr. -- I believe you called

3    it -- termed it a felony takedown, correct?

4        A.   I think I called it an investigative takedown.

5        Q.   Investigative takedown.  All right.  And so --

6        A.   The mission is not just the taking into custody.

7    It was an ongoing narcotics investigation as well.  So it was

8    not just to take him into custody.

9            MR. REGISTER:  Your Honor, may I approach?

10           THE COURT:  Yes.

11   BY MR. REGISTER:

12       Q.   Show you a document on my computer.  Are you

13   familiar with this document?

14       A.   No.

15       Q.   This is a document entitled U.S. Department of

16   Justice Drug Enforcement Administration.  I believe it is

17   Defendant's Exhibit 3.  It is the court report -- I'm sorry,

18   the report of -- can you identify what this document is?

19       A.   No.  I have no idea what that is.

20       Q.   You know who Craig A. Benoit is?

21       A.   Yes.  He's the lieutenant of the narcotics unit.

22   He's a task force officer.

23       Q.   Do you see his name anywhere on this particular

24   document?

25       A.   Uh-uh.

1      Q.   What would his name be -- when it says by Craig
2   Benoit, what would be this document?  Would it be a document
3   he authored?
4      A.   I'm assuming.  I have never seen that.  I don't
5   know what that means.
6           THE COURT:  Mr. Register, the witness has testified
7           he's never seen that document before so he's not the
8           right person to ask about it.  If you have things you
9           want to ask him from the document and ask him if they're
10          true or not, if he knows anything about them, feel free
11          to do that.
12          MR. REGISTER:  Yes, sir.
13   BY MR. REGISTER:
14     Q.   So, in the document, if it indicates that there was
15   a felony takedown that took place, would that be an incorrect
16   statement?
17     A.   No, not necessarily.  The takedown or the
18   investigative stop, I guess there was really -- so,
19   essentially, we pulled up, identified ourselves as law
20   enforcement, and called him out, Mr. Arceneaux and
21   Ms. Babineaux, I believe, at one point so essentially it was
22   a felony takedown, essentially.  I guess just the reason that
23   I'm having issues of wording is because it wasn't -- like I
24   said earlier, it wasn't a traffic stop like lights, siren,
25   pull over to the side of the road type of thing.  It was he's

1  stopped in the driveway, we pulled up, told him to get out.
2  So, I mean, a felony takedown would be accurate description
3  of it.
4       Q.   Okay.  So with the felony takedown, the purpose of
5  a felony takedown is to essentially, for lack of better
6  words, take down the person who is believed or alleged to
7  have committed a felony, correct?
8       A.   Yes, but that is not it.  A felony takedown is
9  essentially, what I would say is, a style of removing people
10 from a vehicle.  It's not solely -- you don't do a felony
11 takedown and that's it.  That is just instead of, like, a
12 traffic stop, some officers may walk up to a vehicle and talk
13 to the driver, some may have the drive step out.  A felony
14 takedown is you don't walk up, you don't call them out.  You
15 would do it safely from a distance, weapons drawn, things
16 like that because of whatever -- whatever dynamic of
17 whatever's going on of they're more of a heightened risk or a
18 heightened safety concern.  So just because there's a felony
19 takedown doesn't mean once that is complete that it is done.
20 That's just essentially a style or a way of removing
21 occupants from a vehicle.
22      Q.   All right.  And so, by using that example, in this
23 case when the felony takedown occurred Mr. Arceneaux was
24 removed from the vehicle, correct?
25      A.   Yes.

1      Q.   Mr. Arceneaux as well as the passengers were both
2   removed from the vehicle, correct?
3      A.   Yes.
4      Q.   Mr. Arceneaux and the passenger were both, I guess,
5   examined or looked at as far as safety, correct?
6      A.   Yes.
7      Q.   And it was determined that neither Mr. Arceneaux
8   nor Ms. Babineaux presented a safety concern, correct?
9      A.   After they were detained, no.
10      Q.   All right.  And so that would mean that the stated
11   testified purposes of the felony takedown was complete after
12   Mr. Arceneaux and Ms. Babineaux exited the vehicle and were
13   detained and determined not to present any safety -- any
14   danger to anyone, correct?
15      A.   I'm sorry.  You lost me on that.  Say again.
16      Q.   No problem.  The purpose of the felony takedown was
17   complete once Mr. Arceneaux and Ms. Babineaux were taken away
18   from the vehicle, detained, and determined not to present a
19   danger to anyone on the scene, correct?
20      A.   Yeah.  That portion of the investigation, yes,
21   would've been --
22      Q.   All right.  So after that -- that was about 10 to
23   12 minutes, correct?
24      A.   No.
25      Q.   Okay.  But 10 to 12 minutes after the stop, that's

1    when canine was called?

2        A.   Yes --

3        Q.   And then --

4        A.   -- approximately.

5        Q.   -- I believe you said it was another 10 to 15

6    minutes before canine arrived?

7        A.   Approximately.

8        Q.   So from the time that the initial felony takedown

9    occurred until the canine officer arrived, roughly 20, 25

10   minutes?

11       A.   Approximately.

12       Q.   Okay.  At what point in time as far as in that

13   initial 10 to 12 minutes before the canine was called, is

14   that whenever the felony takedown took place and it was

15   determined that neither Mr. Arceneaux nor Ms. Babineaux

16   presented a danger to anyone?

17       A.   You're asking if that was in that 10 to 12 minutes?

18       Q.   Correct.

19       A.   Yes.

20       Q.   When these alleged drugs were discovered at the

21   residence at the -- I believe that was the residence the

22   subject of the search warrant, was Mr. Arceneaux's vehicle

23   there?

24       A.   We're still talking about 1200 Robley?

25       Q.   Correct.

1       **A.**   Was his vehicle there?

2       **Q.**   Correct.

3       **A.**   No.

4       **Q.**   So when the drugs were discovered, allegedly

5  discovered, at this residence Mr. Arceneaux's vehicle wasn't

6  there, correct?

7       **A.**   No.

8       **Q.**   Okay.  Ms. Babineaux, she wasn't there, correct?

9       **A.**   No.

10       **Q.**   Mr. Arceneaux himself wasn't there, correct?

11       **A.**   No.

12       **Q.**   At no point in time did anyone observe

13  Mr. Arceneaux putting drugs or anything illegal inside of

14  that particular vehicle that was stopped pursuant to the

15  felony takedown, correct?

16       **A.**   Did anybody see him putting drugs in the vehicle

17  before?  No.

18       **Q.**   Did anybody see him putting any illegal weapons

19  or -- I'm sorry, putting any illegal weapons inside that

20  vehicle?

21       **A.**   No.

22       **Q.**   What about Ms. Babineaux?  Same questions.

23       **A.**   No.

24       **Q.**   Now, I know you mentioned there were photographs

25  inside of the Robley residence, correct?

1      A.   Yes.

2      Q.   And that there were male clothing, correct?

3      A.   Yes.

4      Q.   At any point in time did you see -- did any agent

5   see Mr. Arceneaux with any of this clothing on?

6      A.   Not that I'm -- I don't know.

7      Q.   Any of the shoes on or anything like that?

8      A.   I don't know.

9      Q.   With regards to the photographs, I guess because I

10   believe they were trying to establish a nexus between

11   Mr. Arceneaux and that particular residence, I guess the way

12   you established that nexus was a picture of Mr. Arceneaux

13   inside the residence, correct?

14      A.   Is that -- that's not the only way but, I mean --

15      Q.   But as far as what was discovered, I believe, and I

16   may be wrong, but I believe the question was asked by the

17   Court, one of the questions was how were you able to

18   determine that Mr. Arceneaux was out of there, I believe that

19   may have been the question, kind of paraphrasing, and I

20   believe you answered there were photographs in there and that

21   there were male clothes.

22      A.   And male shoes, right.

23      Q.   Male shoes?

24      A.   I believe there was other ways.  But again, I don't

25   want to speak to the case agent and what he has in his

1    affidavit or may not have.  I just remember those specific

2    things being located during the search warrant.

3         Q.   At no point in time while searching Robley Drive

4    was there any documents or any witnesses found to say

5    definitively that Mr. Arceneaux resided there, correct?

6         A.   Resided there?

7         Q.   Or lived there.

8         A.   I don't know if they spoke to any witnesses and I

9    don't know if there was any documents found.  I don't know.

10        Q.   So nothing, no lease agreements or anything within

11   Robley that said, hey, Mr. Arceneaux signed this and he lives

12   at this particular residence?

13        A.   Not that I'm aware of.  I don't know.

14        Q.   The manager of the particular area or landlord, no

15   one was interviewed to say that Mr. Arceneaux lives at that

16   residence, correct?

17        A.   I don't know.

18             MR. REGISTER:  No further questions, Your Honor.

19             THE COURT:  Thank you.  Any redirect?

20             MR. NICKEL:  Yes, Your Honor.

21                     REDIRECT EXAMINATION

22   BY MR. NICKEL:

23        Q.   Agent Picard, you were asked on cross-examination

24   whether someone else described this as a felony takedown,

25   correct?

1     A.    Yes.

2     Q.    That report that you saw, was that your report?

3     A.    No.

4     Q.    Is it safe to say that sometimes you describe

5  things differently than other officers?

6     A.    Yes.

7     Q.    At that point in the -- we'll call it the takedown,

8  the investigation, were you still investigating a narcotics

9  violation by Tycoby Arceneaux?

10    A.    Yes.

11    Q.    Okay.  Was the vehicle he was stopped in the same

12 vehicle he was seen performing counter-surveillance

13 techniques days before?

14    A.    Yes.

15    Q.    Officers saw Mr. Arceneaux enter and exit that

16 residence on days prior to the search warrant date, correct?

17    A.    The 1200 Robley?

18    Q.    Yes.

19    A.    Yes.

20    Q.    When you stopped the vehicle, I guess when the

21 vehicle was stopped in the driveway, there was an

22 investigation still -- a narcotics investigation still

23 happening, correct?

24    A.    Yes.

25    Q.    There was discussions about whether to tow this

1    car, correct?

2        A.    Yes.

3        Q.    There was discussions about whether to search the

4    car without the canine sniff, correct?

5        A.    Yes.

6        Q.    There was discussions about other things, correct?

7        A.    Yes.

8        Q.    There was discussion with the female on scene,

9    correct?

10       A.    Yes.

11       Q.    There was discussion about Mr. Arceneaux and what

12   belonged to him in the car, right?

13       A.    Yes.

14             MR. NICKEL:  No further questions, Your Honor.

15             THE COURT:  Thank you.  Detective Picard, one

16       additional question.  After Mr. Arceneaux is arrested

17       pursuant to the arrest warrant for reckless driving, did

18       the female passenger indicate that she was going

19       anywhere else?

20             THE WITNESS:  That she was going anywhere else?  I

21       don't think so.  I don't believe so, no.

22             THE COURT:  You testified that was her house,

23       right?

24             THE WITNESS:  Right.

25             THE COURT:  And she subsequently walked into her

1         house?

2              THE WITNESS:  Once we were done?

3              THE COURT:  Well, I suppose, or I guess after you

4         finished talking to her, yes.

5              THE WITNESS:  When we left she was still, I

6         believe, standing in the driveway so I don't know.  I

7         assume she did, but I don't know specifically what she

8         did.  She -- Mr. Arceneaux was okay with allowing her to

9         keep the vehicle.  She was okay with taking

10        responsibility for the vehicle.  We talked a little

11        while in the driveway near the carport area and we left.

12        I don't know specifically what she did afterward.  The

13        last time I remember seeing her she was still standing

14        outside.

15             THE COURT:  You were there, correct?

16             THE WITNESS:  Was I there?

17             THE COURT:  Right.  You were there?

18             THE WITNESS:  Yes.

19             THE COURT:  And did you -- did you observe or hear

20        her say to anybody that she needed to go anywhere else?

21             THE WITNESS:  No.

22             THE COURT:  All right.  Court will be in recess for

23        15 minutes.  We'll come back at 4:10.

24                      (Recess is taken.)

25             THE COURT:  We're back on the record now in

1    22-cr --

2         MR. JOHNSON:  I'm sorry, Your Honor.  Our client is

3    out.

4         THE COURT:  Let's bring the Defendant back in.

5    Thank you, Mr. Johnson.

6         MR. JOHNSON:  Yes, sir.

7         THE COURT:  For the record, the Defendant is now

8    present in court with counsel.  The Court has taken the

9    Defendant's motion to suppress under advisement and will

10   state its reasons on the record.  First, do the parties

11   stipulate -- and listen to my question carefully.  Do

12   the parties stipulate that the Defendant had a

13   reasonable expectation of privacy in the apartment at

14   1200 Robley Drive, Apartment 3112?

15        MR. NICKEL:  Yes, Your Honor.

16        MR. JOHNSON:  Could you repeat that, Your Honor.

17        THE COURT:  In order to rule on your suppression

18   motion I have to first determine that the Defendant had

19   a reasonable expectation of privacy at the apartment at

20   1200 Robley Drive, Apartment 3112.  I'm not asking if he

21   lived there, what his exact relationship; but do you

22   stipulate that he had a reasonable expectation of

23   privacy at that apartment?  Without that he can't move

24   to suppress anything, you understand?

25        MR. JOHNSON:  Right.  Absolutely.  I understand.

1    So he did have one, Your Honor.

2         THE COURT:  It's stipulated by the Government and

3    the Defendant not exactly what that was but that he had

4    a general reasonable expectation of privacy in that

5    apartment.  It's well-established that the exclusionary

6    rule is a judicial doctrine created to deter police

7    misconduct.  Officers generally are entitled to rely on

8    good faith on a valid search warrant that's signed by a

9    neutral magistrate.  Here, in the search of 1200 Robley

10   Drive, Apartment 3112, the Court finds that since the

11   search of 1200 Robley Drive was made pursuant to a valid

12   search warrant the good faith exception to the

13   exclusionary rule applies without regard to whether the

14   underlying affidavit, in fact, established probable

15   cause.  Specifically, the Court finds that the affidavit

16   upon which the warrant was based was not so lacking in

17   the indicia of probable cause as to render official

18   belief in its validity entirely unreasonable.  Although

19   the affidavit doesn't state the sheriff's department's

20   prior relationship, if any, with the informant or

21   whether he or she had previously given reliable

22   information, the affidavit does state the informant's

23   basis for knowledge in detail, specifically that he or

24   she had seen large amounts of narcotics at the

25   apartment, he or she had obtained narcotics from the

1      Defendant at the subject apartment recently and multiple

2      times in the past, and that he or she had spoken with

3      the Defendant via phone to discuss drug transactions.

4      Law enforcement also took steps to corroborate the

5      information received from this informant by conducting

6      surveillance on the apartment, observing what they

7      believed was a drug transaction, and subsequently

8      finding narcotics in the car of the person leaving the

9      subject address that had apparently been obtained from

10     that address.

11          Next, the search of 104 Royalton Parkway, the first

12     search of 104 Royalton Parkway.  This was a search

13     conducted on January 28 of 2022 to obtain information

14     establishing the Defendant was a resident of 104

15     Royalton Parkway.  The search was conducted pursuant to

16     a search warrant signed by a neutral magistrate.

17     Likewise, as before, the fruits of the search are

18     entitled to the good faith exception as the affidavit

19     supporting the search warrant was not so lacking in the

20     indicia of probable cause as to render official belief

21     in its validity unreasonable.  The search was narrowly

22     tailored in scope to documents to establish whether

23     Mr. Arceneaux resided there or not and was based on the

24     fact that the owner of that address, 104 Royalton, was

25     the same as the lessor of the address at 1200 Robley

1      Drive, Apartment 3112, where officers had just found a

2      substantial quantity of drugs as well as officers'

3      observations of the Defendant and the owner of 104

4      Royalton at that address and an open source records

5      search showing the Defendant to be a resident of 104

6      Royalton from October of 2021 through the date of the

7      search, which was January 28, 2022.

8          The second search of 104 Royalton did not yield any

9      evidence.  Accordingly, the Court will not address its

10     validity.

11         Next, the search of the Defendant's truck.  As to

12     the search of this truck, testimony taken in court today

13     revealed that the Defendant's arrest was made pursuant

14     to a lawful search warrant signed by a commissioner for

15     reckless driving and that the sheriff's department's

16     subsequent search of his truck was supported by probable

17     cause and, thus, lawful pursuant to the automobile

18     exception to the search warrant requirement.

19     Specifically, a search that day, on the day of the

20     search of the truck was also -- just prior to that was a

21     search of the address at 1200 Robley Drive, Apartment

22     3112, where 10 pounds of methamphetamine had been found

23     as well as a dog sniff of the truck subsequent to the

24     Defendant's arrest indicating the presence of narcotics

25     and information found at the Apartment 3112, 1200 Robley

1    Drive, linking the Defendant with that apartment.

2         Accordingly, the Defendant's motion to suppress is

3    denied.  Mr. Dicharry -- oh.  Do you object to that?

4         MR. REGISTER:  Yes, sir.

5         THE COURT:  Okay.

6         MR. REGISTER:  Your Honor, respectfully, with

7    regards -- just for the record, I would like to object

8    to the Court's ruling with regards to denying the motion

9    to suppress each search warrant as well as the truck

10   that was searched in this particular case, Your Honor.

11        THE COURT:  Okay.  It was also brought to the

12   Court's attention that there was a spectator that was

13   videoing this proceeding.  There's clearly stated signs

14   at the door.  Deputy Dicharry, will you please identify

15   who that was.

16        MR. DICHARRY:  Individual in the blue.

17        THE COURT:  Sir, will you please approach at this

18   time.  Come up here.  Stand right there.  Did you know

19   you're not supposed to video recordings in federal

20   court?

21        UNIDENTIFIED SPEAKER:  (Shakes head side to side.)

22        THE COURT:  You didn't see the sign right outside

23   the door?

24        UNIDENTIFIED SPEAKER:  I never -- no, sir.

25        THE COURT:  I'm going to ask you -- I've been urged

1          by the marshal service to hold you in contempt.  I don't

2          want to do that.  I don't agree with the rule that cell

3          phones are allowed in the building in the first place.

4          I'm going to take you at your word.  If you work with

5          Deputy Dicharry right now to delete the video off your

6          phone, we'll end it here.  Okay.

7                UNIDENTIFIED SPEAKER:  Yes, sir.

8                THE COURT:  You promise me you'll do that?

9                UNIDENTIFIED SPEAKER:  Yes, sir.

10               THE COURT:  Court's in recess.

11                     (Proceedings adjourned.)

12

13

14                         * * * * * * *

15

16

17                          **CERTIFICATE**

18

19          I hereby certify this 28th day of September, 2022 that

20     the foregoing is, to the best of my ability and

21     understanding, a true and correct transcript of the

22     proceedings in the above-entitled matter.

23

24                                   *Deidre D. Juranka*

25                              Deidre D. Juranka, CRR
                                 Official Court Reporter